UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
ALI SAYYED,

Plaintiff,

-against-

CITY UNIVERSITY OF NEW YORK,

Defendant.
-------------------------------------------------------X

**COMPLAINT**
**(JURY TRIAL DEMANDED)**

The Plaintiff, ALI SAYYED by his attorney, STEWART LEE KARLIN, complaining of Defendant, CITY UNIVERSITY OF NEW YORK, alleges upon knowledge as to herself and her own actions and upon information and belief as to all other matter, as follows:

**NATURE OF THE CLAIM**

1. This is a civil action based upon Defendant's violations of the Americans with Disabilities Act, 42 U.S.C. § 12182 and Section 504, 29 U.S.C. 794 by discriminating against Plaintiff due to his disability and perceived disability and failure to reasonably accommodate the Plaintiff. Plaintiff is seeking damages for violating her civil rights.

2. Defendant targeted, harassed, and discriminated against Plaintiff on the basis of his protected characteristics—specifically his ethnicity (Palestinian), religion (Muslim), (Title VI) disability, and perceived disability—and further violated civil rights laws by refusing to engage in an interactive process or provide Plaintiff with reasonable accommodations, directly causing Plaintiff severe financial harm, emotional distress, and irreparable loss of civil liberties.

**JURISDICTION AND VENUE**

3. The Court has jurisdiction over Defendant City University of New York (CUNY) pursuant to 42 U.S.C § 12117 and 28 U.S.C. 1331.
4. Venue lies in this District pursuant to 28 U.S.C. 1391 (b) (2) as a substantial part of the events giving rise to the claim arose in New York County.

**PARTIES**

5. At all times hereinafter mentioned, Plaintiff Ali Sayyed("Plaintiff"), was and still is a student of Defendant CUNY at City College of New York
6. Defendant CUNY is a recipient of federal financial assistance as defined by Section 504 (29 U.S.C. 794) and the regulations promulgated thereunder.
7. Defendant CUNY offers a variety of programs and services for students that have disabilities for the student to gain access to their education.
8. Plaintiff is a qualified individual (severe ADHD, PTSD and a history of two strokes) with a disability in that he met the essential requirements for receiving services and reasonable accommodations. Plaintiff's disability without reasonable accommodations directly adversely impacts his education.
9. Plaintiff has a impairment that substantially limits one or more major life activities, had a record of such an impairment, and was regarded as having such an impairment. Plaintiff also participated in protected activity pursuant to the A.D.A. by requesting reasonable accommodations that was not timely granted and not fully implemented in part by Defendant.

## FACTUAL STATEMENT

10. In approximately January 2020, Plaintiff duly enrolled as a second-degree Mechanical Engineering major at the City College of New York (CCNY) in NYC after having previously graduated with a bachelor's degree from Fordham.

11. At the time of Plaintiff's enrollment, he was provided by Defendant with Defendant's policies regarding academic criteria for graduation and the EEO policies from the school, as well as the appeal procedures in the event of an alleged breach of the agreement. This formed the contract between Plaintiff and Defendant.

12. The contract was based on the terms and conditions for graduation that Defendant offered at the time of Plaintiff's enrollment. Implicit in the contract is not to act discriminatorily and retaliatorily when applying the policies to a given situation.

13. Defendant, by and through its agents, breached the contract in the State of New York and violated federal anti-discrimination laws hereinafter more specifically described.

14. Plaintiff initially applied for the following accommodations based on his disabilities:

(1) Additional flexibility from professors in order to account for the severity of his ADHD, the medical complications that exacerbate his condition and in order to reduce his stress

(2) At least triple time on exams and quizzes

(3) Extensions on homework and deadlines

(4) Priority registration

(5) Preferential seating in class

(6) Ability to take breaks of any length as needed during exams and in class

(7) Ability to take exams from home

(8) Use of recording devices as needed

(9) Access to a note-taker.

15. Plaintiff provided medical documentation and requested reasonable accommodations

16. On August 29, 2022, the following accommodations were approved:

1. Extended time for testing: Triple (3x) the time that the class receives to complete exam and quizzes *

2. Scribe for exams *

3. Exams administered in a reduced distraction environment (semi private room) *

4. Permit breaks during exams *

5. Ability to backtrack on exams and quizzes

Classroom Accommodations:

1. Priority registration

2. Permit breaks during classroom time

3. Verification of disability-related absences:

4. Flexibility with assignment deadlines: the Accessibility Center will obtain disability documentation for extensions from the student's provider and will then provide a letter of verification for faculty.

17. Subsequently, there was verbal abuse from my first Accessibility Specialist (Lisa Durvett) which led to Plaintiff being transferred to another specialist in the office.

18. Following the approval of Plaintiff's accommodations, Defendant, through its designated AccessAbility Center Specialist, Lisa Durvett, subjected Plaintiff to severe verbal abuse, hostility, and harassment when Plaintiff sought to utilize his approved accommodations.

19. Ms. Durvett's hostile interactions and aggressive conduct toward Plaintiff created an intimidating educational environment, hindered Plaintiff's ability to seamlessly receive his approved accommodations, and exacerbated Plaintiff's disability-related symptoms.

20. Due to the severe distress and interference caused by Ms. Durvett's conduct, Plaintiff was forced to request a transfer and was subsequently reassigned to another Accessibility Specialist within the AccessAbility Center.

21. Plaintiff faced resistance from professors to comply with Plaintiff academic accommodations.

22. Throughout Plaintiff's enrollment, Defendant's academic faculty engaged in a widespread, organized pattern of non-compliance, active resistance, and hostility regarding Plaintiff's officially approved AccessAbility accommodations.

23. When Plaintiff presented his accommodation letters or requested the implementation of his approved rights—including extended testing time, deadline flexibility, and classroom accommodations—multiple professors subjected Plaintiff to severe verbal reprimands, hostile questioning, and public embarrassment in front of his peers.

24. Defendant's faculty repeatedly attempted to pressure, coerce, and dissuade Plaintiff from utilizing his legal accommodations, treating approved academic modifications as unearned privileges or administrative burdens rather than mandatory civil rights protections.

25. Said faculty resistance was not isolated, but rather represented a systematic, coordinated effort across departments within CCNY to undermine Plaintiff's academic standing, single him out for heightened scrutiny, and create a hostile educational environment intended to force his withdrawal or cause him to fail his degree requirements.

26. Defendant failed to enforce its own accommodation directives against its faculty, permitting professors to disregard Access-Ability mandates, directly depriving Plaintiff of equal access to Defendant's educational programs in violation of federal, state, and city anti-discrimination laws.

27. There was a failure of the AccessAbility Office to give Plaintiff full time extension during multiple exams which resulted in him getting lower grades on my exams.

28. On multiple occasions during Plaintiff's academic enrollment, Defendant's AccessAbility Center, by and through its staff, failed and refused to grant Plaintiff his full, approved triple-time (3x) testing extension during examinations.

29. Defendant's failure to implement Plaintiff's approved accommodation severely impeded Plaintiff's ability to complete his examinations under equal testing conditions, resulting in artificially depressed exam scores, lower course grades, and direct damage to Plaintiff's cumulative GPA and academic standing.

30. Defendant, through AccessAbility Center staff members Leanna James, Suhaylah Dean, and Arlene Guzman, engaged in a continuous pattern of selective enforcement and discriminatory treatment targeting Plaintiff during exam administrations. These staff members subjected Plaintiff to arbitrary, burden-imposing procedures that were not enforced against non-protected students or other disabled students outside Plaintiff's protected classes. Specifically, staff selectively required Plaintiff to complete sign-in and sign-out protocols immediately prior to and after entering the examination room—a procedure never previously required of Plaintiff, never enforced for non-Muslim, non-Palestinian students, and enforced inconsistently to disrupt and harass Plaintiff prior to high-stakes testing.

31. The implementation of these unprecedented procedural hurdles by Ms. James, Ms. Dean, and Ms. Guzman was non-essential to exam security, constituted differential treatment without any legitimate academic or administrative justification, and was designed to intimidate, distract, and penalize Plaintiff on the basis of his disability, perceived disability, ethnicity, and religion.

32. There was inconsistent enforcement of rules with only Plaintiff at the AccessAbility Office during administration of his exams (i.e. insisting Plaintiff sign in/out of the exam room when they had never done this before and were not asking other students to do the same).

33. The Campus security repeatedly failed to enforce administrative remedies, dismissing safety/disruptive complaints with indifference and minimal corrective action.

34. Following complaints, Plaintiff was subjected to hostile glares, intentional aggravation, and physical pursuit/yelling down the hallway by staff.

35. There was inconsistent enforcement of bag checking rules and dress codes with Plaintiff and only me at CCNY's gym (asking me to store my bag in a locker when having never asked this before and when not asking other students to do the same) and subsequent targeted and retaliatory behavior against Plaintiff by staff.

36. Beginning in September 2023, staff members at Defendant's CCNY Fitness Center/Gym engaged in a continuous pattern of selective enforcement, harassment, and discriminatory rule-making specifically targeting Plaintiff.

37. Gym staff subjected Plaintiff to arbitrary demands—including requiring Plaintiff to check his personal bag in a locker room—a requirement never imposed on Plaintiff previously and not enforced against non-Muslim, non-Palestinian, non-disabled students entering the facility, as verified by video evidence preserved by Plaintiff.

38. In September 2023, Plaintiff submitted a formal complaint regarding the gym staff's targeted harassment and differential treatment. Rather than taking corrective action, Defendant permitted gym personnel to engage in continuous retaliatory behavior, culminating in staff repeatedly attempting to provoke Plaintiff into physical confrontations.

39. On February 6, 2024, at approximately 4:00 PM, Plaintiff entered the CCNY gym peacefully while wearing headphones and without disturbing anyone. The same staff member involved in the prior bag-checking disputes intercepted Plaintiff and arbitrarily prohibited him from using the facility based on his footwear—footwear Plaintiff had routinely worn in the gym on numerous prior occasions without objection.

40. When Plaintiff requested to speak directly with gym management to resolve the footwear issue, staff immediately summoned Public Safety officers to the scene, despite the absolute absence of any argument, verbal altercation, physical threat, or safety hazard. Campus Security Officers Pollard and Clarke responded to the scene. The officers refused to address why security had been dispatched for a routine administrative matter, invaded Plaintiff's personal physical space, placed their hands in close proximity to Plaintiff's face in a threatening manner, and refused Plaintiff's repeated de-escalation requests to step back.

41. Officer Clarke demanded Plaintiff's institutional identification card. Upon examining Plaintiff's ID, Officer Clarke intentionally tossed the card onto the floor instead of returning it to Plaintiff's hand, executing a deliberate public humiliation designed to degrade Plaintiff. Additionally, Officers Pollard and Clark did not respect Plaintiff's personal space or physical boundaries – they repeatedly had their hands close to his face while talking in an aggressive way to Plaintiff. Plaintiff repeatedly requested that they put their hands down; they simply told him to back up and create more distance between us rather than respecting his boundaries and using wise de-escalation techniques that would have benefited all of us.

42. Later, Lieutenant Hickey of Campus Safety showed up and eventually (and cooperatively) left the gym with him and the officers. Plaintiff made clear to Lieutenant Hickey that he would not tolerate any disrespectful or aggressive behavior from campus safety anymore.

43. Plaintiff subsequently exited the facility with Lieutenant Hickey of Campus Safety. When Plaintiff formally reported the aggressive conduct, physical intimidation, and discriminatory targeting to university management, Defendant issued written communications denying any staff misconduct, actively concealing employee wrongdoing, and ratifying the unlawful, discriminatory treatment of Plaintiff.

44. Defendant lost his final exam in one class by the AccessAbility Office which delayed him from getting a grade and being able to register for other classes; somehow the exam was magically found several months later only after Plaintiff hired a lawyer and then he finally received a grade in the class.

45. As a direct result of Defendant's misplacement of Plaintiff's examination, Plaintiff was arbitrarily denied a timely grade for the course. This administrative failure caused immediate, severe collateral damage, including delaying Plaintiff's course progression, blocking timely course registration, and destabilizing Plaintiff's academic standing.

46. Upon discovering that his examination was lost, Plaintiff formally requested to review his exam paper once located. Defendant arbitrarily and unlawfully denied Plaintiff's request to inspect his examination, violating institutional regulations and basic principles of academic transparency

47. In addition, there was an outburst at Plaintiff by a proctor at the AccessAbility Office over his break time which led to her verbally abusing Plaintiff, confiscating his unfinished exam (despite not having the authority to do so) and emailing his professor that he had taken a 2 hour break without checking the cameras in the office to confirm this (and potentially jeopardizing his grade in the class and my relationship with that professor) and which led to the Office of Student Conduct investigating Plaintiff (but not her).

48. During an examination administered at the AccessAbility Center, proctor Leanna James subjected Plaintiff to a hostile verbal outburst concerning Plaintiff's utilization of his approved classroom/exam break accommodations. Without regulatory or institutional authority, Ms. James aggressively confiscated Plaintiff's unfinished examination paper before his allotted time had expired.

49. Following the seizure of Plaintiff's exam, Ms. James transmitted a false and defamatory report to Plaintiff's course professor, claiming that Plaintiff had taken an unauthorized two-hour break.

Ms. James submitted this report without reviewing available security camera footage or verifying access logs, intentionally creating a false impression of academic dishonesty to damage Plaintiff's academic standing and relationship with faculty. Rather than investigating Ms. James's improper conduct and unauthorized exam seizure, Defendant's administration initiated a formal disciplinary investigation against Plaintiff through the Office of Student Conduct, placing Plaintiff's academic status, reputation, and degree completion in immediate jeopardy.

50. Following an investigation, Defendant's Director of Community Standards, George Rhinehart, and Director of the AccessAbility Center, Leigh Britton, formally admitted that the disciplinary report filed against Plaintiff by Ms. James was false, exaggerated, and unfounded.

51. The initiation of a baseless disciplinary investigation against a disabled, Muslim, Palestinian male student exercising approved civil rights accommodations constitutes unlawful retaliation, discrimination, and severe harassment under Title VII, Title II of the ADA, Section and 504.

52. There was a refusal by the AccessAbility Office and the gym to check camera footage to confirm what Plaintiff was experiencing at each office/facility (i.e. of his sign in/out times or to view the behaviors of the gym staff towards Plaintiff).

53. Despite repeated written and verbal requests from Plaintiff, Defendant's AccessAbility Center and campus recreation/gym management intentionally refused to review or preserve available security camera footage. This video evidence would have conclusively verified Plaintiff's actual sign-in/sign-out times, confirmed the actual length of his exam breaks, and documented the abusive conduct of staff towards Plaintiff.

54. Director Leigh Britton repeatedly promised Plaintiff that administration would conduct a thorough, objective investigation into the misconduct of staff members (including Ms. James). However, Mr. Britton persistently failed and refused to review the objective surveillance

evidence or interview key witnesses. Mr. Britton's refusal to investigate was motivated by bias and a bad-faith intent to shield staff from accountability while penalizing Plaintiff.

55. Defendant's AccessAbility Center staff subjected Plaintiff to arbitrary, discriminatory enforcement of break protocols. Staff rudely forced Plaintiff to execute unprecedented sign-in and sign-out procedures that had never been required during his prior exams and were not enforced against similarly situated, non-Muslim, non-Palestinian students.

56. Staff within the AccessAbility Center systematically subjected Plaintiff to an ongoing pattern of unprofessional, aggressive, and hostile treatment. This continuous hostility created an intimidating, offensive, and disruptive environment that interfered with Plaintiff's access to educational programs and accommodations.

57. Plaintiff sought administrative recourse by scheduling a formal meeting with AccessAbility Center Manager Patricia Bianchi to report systemic abuse and non-compliance. During this meeting, Ms. Bianchi refused to accept, review, or read Plaintiff's detailed, hard-copy written report of the incidents and failed to perform any promised follow-up, thereby actively concealing institutional non-compliance and ratifying the discriminatory conduct of her subordinate staff.

58. A staff member there (**Leanna James**) verbally exploded at Plaintiff during a disagreement about his break time, confiscating his exam without having authority to do so, then lying about the length of the break that he took and then filing a complaint about him despite the fact that she had been the one out of line.

59. There was inconsistent enforcement of rules around taking breaks (i.e. Plaintiff was rudely ordered to sign in and out despite having never been asked to do so before.)

60. There was a continued failure on the part of **Mr. Britton** to properly investigate the incidents as promised multiple times (i.e. to look at the camera footage to easily determine once the length of Plaintiff's break.) Mr. Britton's clear reluctance to do this shows a bias against Plaintiff.

61. There was also a consistent and unprofessional, rude and negative attitude directed at Plaintiff at all times by many who work there.

62. There was a meeting with the manager of the office (**Patricia Bianchi**) to address Plaintiff's concerns who promised to follow up but she never followed up.

63. During his senior year, Plaintiff repeatedly requested, via written email correspondence and in-person inquiries at the AccessAbility Center, to meet with AccessAbility Manager Patricia Bianchi. The purpose of these requests was to access specialized disability employment leads, career development resources, and vocational placement programs available to senior students with disabilities. Despite Plaintiff's persistent efforts over an entire academic year, Ms. Bianchi completely ignored Plaintiff's meeting requests, failing to respond to emails or provide any schedule availability, thereby completely denying Plaintiff access to critical post-graduation employment assistance and career placement programs.

64. Ms. Bianchi's assertion of unavailability was entirely pretextual. During the same period, Plaintiff personally observed Ms. Bianchi present in the office routinely meeting with other students for extended hours to fill her daily schedule, while selectively and systematically excluding Plaintiff—a disabled, Palestinian, Muslim male student—from receiving equal access to institutional career resources. Defendant's intentional, bad-faith exclusion of Plaintiff from specialized employment resources deprived Plaintiff of equal educational and professional advancement opportunities, directly impeding his transition into the engineering workforce and causing severe long-term professional and economic injury.

65. Plaintiff was advised by Ms. Bianchi that Plaintiff had to come in person to the Accessibility Office to be accommodated on an exam despite the fact that the class he was taking (**PHYS 32100**) was an online course and every other student in the class was taking the test from home; Ms. Bianchi's directive subjected Plaintiff to single-out, burdensome physical attendance

requirements that were not imposed on non-disabled, non-Muslim, or non-Palestinian peers enrolled in the same course. Defendant effectively conditioned the receipt of Plaintiff's legally mandated disability accommodations on his submission to extra-ordinary procedural hurdles and unnecessary in-person travel, penalizing Plaintiff for exercising his rights under federal, state, and city civil rights laws and establishing clear disparate treatment.

66. On or about Tuesday, February 20, 2024, Professor Niell Elvin subjected Plaintiff to targeted harassment and discriminatory discipline during a scheduled lecture. Despite having direct actual notice that Plaintiff was registered as a student with disabilities who required technology assistance for note-taking, Prof. Elvin aggressively prohibited Plaintiff from using his cellular phone to capture board notes or utilizing his laptop computer to take class notes.

67. When Plaintiff attempted to explain his registered accommodation needs, Prof. Elvin acted with hostility, aggressively rejected Plaintiff's explanation during an immediate office meeting, and forcibly escalated the matter by marching Plaintiff directly to the Department Chair's Dr. Delale office to institute formal disciplinary action against Plaintiff.

68. Shortly after humiliating Plaintiff and reporting him to the Department Chair, Prof. Elvin abruptly reversed his policy and permitted the entire class to utilize electronic devices freely during lectures. Professor Elvin's targeted prohibition against Plaintiff—followed by his sudden allowance of devices for non-disabled peers—demonstrates that his initial prohibition was not based on a legitimate academic policy, but was an arbitrary, bad-faith effort to harass, intimidate, and single out Plaintiff on the basis of his disability, ethnicity, and religion.

69. Professor Ronald L. Koder (James Peace Chair of Physics), instructor for Physics 31500 (PHYS 31500), subjected Plaintiff to a highly unusual, coercive, and demeaning procedure by requiring Plaintiff to stand while holding a physical sign displaying his name and photographing Plaintiff

on Prof. Koder's personal cellular device, under the pretext of using the image to identify students for grading purposes.

70. Following the administration of Plaintiff's PHYS 31500 examination at the AccessAbility Center, Prof. Koder engaged in active non-compliance and resistance by flatly refusing to retrieve Plaintiff's completed examination from the AccessAbility Center for several weeks, despite Plaintiff's repeated requests and growing distress over his missing course grade.

71. AccessAbility Center Director Leigh Britton was formally notified of Prof. Koder's bad-faith refusal to collect and grade Plaintiff's examination. Although Director Britton sent written inquiries to Prof. Koder regarding the ongoing delay, Defendant took no effective administrative or disciplinary action to enforce institutional compliance or compel the timely retrieval of Plaintiff's exam.

72. As a direct result of Prof. Koder's bad-faith refusal and Defendant's administrative failure, Plaintiff's examination was left unretrieved for weeks while all non-disabled students in PHYS 31500 received their grades in a timely manner. Prof. Koder's conduct subjected Plaintiff to severe administrative delay, academic uncertainty, and differential treatment solely because Plaintiff exercised his civil rights to take his examination under approved testing accommodations at the AccessAbility Center.

73. During the Fall 2023 academic term, Plaintiff was enrolled in Mechatronics (ME 31100), instructed by Dr. Ioana Voiculescu. On multiple major examinations—including the final examination—Defendant's AccessAbility Center failed and refused to grant Plaintiff his full, legally mandated extended exam time, forcing Plaintiff to complete testing under high-stress, shortened conditions and preventing him from utilizing approved rest break accommodations.

74. Dr. Voiculescu acknowledged the AccessAbility Center's failure to provide Plaintiff's full-time accommodations on at least one examination and attempted to remediate the violation by

unilaterally adding ten (10) points to Plaintiff's score. This arbitrary adjustment was entirely insufficient, imprecise, and failed to cure the direct damage to Plaintiff's overall performance, exam metrics, and course grade caused by Defendant's structural failure to administer the exams under lawful conditions.

75. On multiple occasions throughout the term, Dr. Voiculescu repeatedly misassigned Plaintiff's group coursework, mistakenly grading Plaintiff under the submissions of incorrect student groups. Each instance of misattribution involved Dr. Voiculescu improperly conflating Plaintiff with other non-white students/students of color, demonstrating discriminatory carelessness and racial/ethnic stereotyping that directly impaired Plaintiff's grade accuracy.

76. When Plaintiff raised these continuous administrative and grading errors, Dr. Voiculescu refused to address the issue and directed Plaintiff to submit all complaints exclusively to Department Chair Dr. Feridun Delale. Plaintiff promptly submitted formal grievances to Dr. Delale, but Dr. Delale failed and refused to respond, investigate, or review Plaintiff's course grade, leaving Plaintiff without administrative recourse or procedural due process.

77. Defendant's failure to properly administer examinations under approved accommodations, combined with arbitrary grade adjustments, stereotyping in assignment grading, and deliberate refusal to investigate Plaintiff's grade appeal, directly resulted in an artificially depressed final grade in ME 31100, constituting unlawful disability discrimination, racial/national origin discrimination, and retaliation under Title VI, Title II of the ADA, and Section 504.

78. In September 2023 Plaintiff filed a complaint about being targeted by staff members at the CCNY gym when the workers there started demanding that he and only Plaintiff had to check his bag in a locker room after having never asked me to do so before and while not asking anyone else in the gym to do the same.

79. In October 2023, Plaintiff was approached by a campus safety officer at an on-campus protest about the war in the Middle East and was made to leave. Plaintiff was the only one approached, despite the fact that there was a huge crowd of students loudly protesting and making their voices heard. A Campus Safety officer intentionally bypassed the large crowd of non-Palestinian, non-Muslim demonstrators and selectively targeted Plaintiff—a visible Palestinian, Muslim student—physically confronting him, challenging his presence, and attempting to force him off campus grounds.

80. The security officer's physical confrontation of Plaintiff was so egregious and unprovoked that surrounding students were forced to intervene, confronting the officer directly to compel him to release Plaintiff. Defendant's campus safety personnel singled out Plaintiff as the sole individual targeted for physical removal out of a large, vocal crowd of demonstrators, establishing clear disparate treatment, racial and religious profiling, and bad-faith suppression of civil liberties under Title VI.

81. On April 24, 2024, at approximately 2:50 PM, Plaintiff attempted to enter campus to attend his scheduled Mechanical Engineering course, ME 47300. As Plaintiff approached the entrance gate, he was intercepted, stopped, and physically barred from entering the campus by security personnel led by Christopher Gorman, Director of Veterans Affairs.

82. Despite Plaintiff displaying a valid institutional identification card, Mr. Gorman and the security personnel engaged in aggressive physical confrontation and harassment. Said personnel intentionally pressed their bodies against Plaintiff's body and made inappropriate, invasive physical contact near Plaintiff's groin area in an unprovoked, hostile attempt to intimidate and physically provoke Plaintiff.

83. Upon being turned away at the primary gate, Plaintiff attempted to gain entry through alternative campus access gates, where personnel falsely claimed that the campus was closed. When Plaintiff

returned to the primary gate, he observed that the campus remained fully open, other students were entering without hindrance, and his ME 47300 class was proceeding normally.

84. Defendant selectively barred Plaintiff—and Plaintiff alone—from entering campus while permitting non-Muslim, non-Palestinian students unrestricted access to the facility and academic instruction, directly depriving Plaintiff of educational instruction and establishing severe, intentional civil rights violations under Title VI.

85. Plaintiff was summoned to a formal disciplinary conference May 20, 2024 by Dr. Lydia Travis, Director of Student Conduct and Community Standards, based on baseless reports alleging that Plaintiff had engaged in vulgar or disruptive behavior toward campus security staff. During this recorded conference, Dr. Travis refused to permit Plaintiff's legal counsel to attend or participate and repeatedly failed and refused to identify any specific campus security personnel or witnesses who made the underlying allegations against Plaintiff.

86. The disciplinary summons was entirely pretextual and initiated in bad faith. The underlying campus encounter did not involve CUNY security personnel, but rather involved an outside individual present on campus during a student demonstration regarding the conflict in Gaza, who was actively filming, harassing, and verbally abusing female CUNY students.

87. Plaintiff had intervened to protect fellow students from said harassment in the presence of law enforcement officers (including local police and federal agents). Rather than protecting its students from external harassment, Defendant initiated retaliatory disciplinary proceedings against Plaintiff—a visible Palestinian, Muslim male student—singling him out for heightened administrative scrutiny, intimidation, and selective disciplinary enforcement.

88. Defendant's use of the Office of Student Conduct to target Plaintiff without procedural due process, basic evidentiary disclosure, or representation constitutes selective enforcement,

intentional discrimination based on race, ethnicity (Palestinian), and religion (Muslim), and unlawful retaliation under Title VI, Title II of the ADA.

89. These actions against Plaintiff. have a profound and everlasting impact on Plaintiff, including irreparable damage to her academic and professional career. These actions are deliberate, intentional discrimination and retaliation.

## FIRST CLAIM FOR RELIEF-ADA

90. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

91. Plaintiff is a protected individual within the meaning of the Americans with Disabilities Act 42 U.S.C. 12182.

92. Plaintiff has a disability within the meaning of the A.D.A.

93. Defendant CUNY is a statutory party within the meaning of the A.D.A.

94. Defendant violated the A.D.A. by failing to *timely* reasonably accommodate Plaintiff and by otherwise subjecting her to discrimination due to his disability and perceived disability which and subjected him to a hostile academic environment due to Plaintiff's disability, perceived disability and retaliation.

95. As a result of the willful activities of Defendant, Plaintiff has been deprived of educational opportunities based upon her disability and perceived disability in violation of the Americans with Disabilities Act 42 U.S.C. 12182 and suffered damages as a result of Defendant violating the A.D.A.

## SECOND CLAIM FOR RELIEF-504

96. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

97. Section 504 was violated because Plaintiff was an otherwise qualified individual with a disability and was excluded from participation and denied the benefits of and subjected to discrimination solely by reason of her disability and perceived disability.

98. As a result of the foregoing conduct, CUNY has violated. Section 504, 29 U.S.C. 794 and the regulations promulgated thereunder resulting in Plaintiff being damaged.

## PLAINTIFF HEREIN DEMANDS A TRIAL BY JURY ON ALL ISSUES AND CLAIMS IN THIS ACTION

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

a. A declaration that CUNY has violated the A.D.A. and Section 504 of the Rehabilitation Act and that Plaintiff's rights have been violated under the A.D.A. and 504 and any other equitable relief that the Court deems necessary to correct the conditions complained of herein.

b. Compensatory damages to Plaintiff for the damages incurred including but not limited, additional tuition, pain and suffering, lost income due to the delay in graduating and damages to Plaintiff's reputation;

c. Attorney fees and costs, cannot yet be determined.

d. Any other relief that is just and equitable.

Dated: New York, New York
August 7, 2026

Respectfully submitted,

STEWART LEE KARLIN
LAW GROUP, P.C.

______________________________
STEWART LEE KARLIN, E.S.Q.
*Attorney for Plaintiff*
111 John St., 22nd Floor
New York, NY 10038
(212) 792-9670